UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TIM J. S.,                                )
                                          )
                 Plaintiff,               )
                                          )
        vs.                               )        Case No. 4:19 CV 1709 (JMB)
                                          )
ANDREW M. SAUL,                           )
Commissioner of the Social                )
Security Administration,                  )
                                          )
                 Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On November 15, 2016, plaintiff Tim S. protectively filed applications for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of October 17, 2016.  (Tr. 139-45, 146-51, 152-53).   After plaintiff's applications were denied on initial consideration (Tr. 55-63, 64-72), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 82-83).

Plaintiff and counsel appeared for a hearing on August 16, 2018.  (Tr. 28-54).  Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.  The ALJ also received testimony from vocational expert Susan Johnson, M.S.  The ALJ issued a decision denying plaintiff's applications on November 19, 2018.  (Tr. 12-27).  The Appeals Council denied

plaintiff's request for review on May 31, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in March 1992 and was 34 years old on his alleged onset date.  (Tr. 22). As a child, he was diagnosed with attention deficit disorder (ADD) and received special education services in mathematics and study skills.  He functioned within the average range of cognitive abilities.  It was noted that he stuttered when he spoke too quickly.  (Tr. 264).  He graduated from a technical college with an Associate's degree in applied science and a Bachelor of Science degree in digital entertainment and game design.  (Tr. 242).  He worked as an embossing machine operator for the nine years before his alleged onset date, and previously worked as a receptionist and cashier, and in food preparation.   (Tr. 36, 189).   He lived with his parents and had never lived independently.  (Tr. 34-35).  Plaintiff claimed that he was disabled due to a seizure disorder.  (Tr. 172).  He was not taking any medications when he filed his applications in late 2016.  (Tr. 174). In June 2018, his medications included Concerta to treat ADD, the nonsteroidal anti-inflammatory meloxicam, Keppra to treat seizures, and an albuterol inhaler for asthma.  (Tr. 238).

In his November 2016 Function Report (Tr. 205-15), plaintiff stated that he was unable to work because he experienced seizures and could no longer safely operate machinery.  His daily activities consisted of feeding the family dogs, taking them outside, eating meals, taking medication, washing dishes, watching television, and reading.  He was able to manage his personal care, prepare simple meals, and complete household chores.  He did not do yard work because he did not want to risk having a seizure while outside for an extended time.  He no longer drove for the same reason.  He had no difficulty shopping, managing financial accounts, and sleeping.  His

hobbies and interests included reading, movies, Japanese culture, assembling plastic models, and classic cars.  He socialized with family and friends both in person and on social media.  Because he did not drive, he only went places with his parents.  Plaintiff had difficulties with lifting, talking, memory, and concentration.  He explained that lifting was somewhat difficult because he had herniated discs in his neck and experienced pain if he lifted too much.  His ADD affected his memory and concentration at times.  He was able to follow written instructions "pretty well" after reading them over a couple of times but had to ask for spoken instructions to be repeated.  He had no difficulty getting along with others, including authority figures, and handled stress and changes in routine easily.  He also noted that he had a speech impediment.

At his August 2018 hearing, plaintiff testified that using his left (and dominant) hand caused numbness in his hand and pain in his neck.  (Tr. 40-41).  He also experienced flares of pain when bending, lifting, carrying, reading, typing, or playing video games for a prolonged time. (Tr. 41-43, 46-47).  The pain caused three or four short-lived headaches each day.  (Tr. 44).  Plaintiff testified that his short-term memory "[was]n't all that great" and he forgot "stuff pretty easily." (Tr. 45).  As an example, he stated that he frequently had to ask his mother to remind him what she just asked him to do, sometimes within seconds of her first request.  (Tr. 45-46).  In response to a question from counsel, he stated that he often checked the front door multiple times when leaving the house to make sure it was locked.  (Tr. 47).

Vocational expert Susan Johnson testified that plaintiff's past work as an embossing machine operator was semi-skilled, medium work.[1]  (Tr. 49).  The ALJ asked Ms. Johnson to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform work at the light exertional level; who could lift,

---

[1] Ms. Johnson testified that the job had a Specific Vocational Preparation (SVP) level of 3.

carry, push, and pull 20 pounds occasionally and 10 pounds frequently; was limited to only occasional overhead reaching with the dominant arm; could sit, stand, or walk for six hours in an eight-hour day; could never climb ladders, ropes, or scaffolds; and had to avoid environmental hazards, including hazardous machinery.  Such an individual would be unable to perform plaintiff's past work as an embossing machine operator, but could perform other jobs available in the national economy, including furniture rental clerk, cashier II, and ticket seller.  (Tr. 50).  These jobs could be performed if the individual were additionally limited to simple, routine tasks, and required redirection once per day.  Being off-task more than 10 percent of the workday or requiring additional redirection precluded employment.   (Tr. 50-51).   In response to questions from plaintiff's counsel, Ms. Johnson testified that all work would be precluded for an individual who had three unscheduled 10-minutes disruptions each day.  (Tr. 52).  Ms. Johnson stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (SCO), with the exception of information regarding reaching and time off-task.  She testified that the DOT did not address these two limitations and that she relied on her "experience doing job placement toward employment."  (Tr. 52).  In response to a question from counsel, Ms. Johnson stated that she derived her information regarding the numbers of jobs in the national economy from a program called SkillTRAN, which is discussed further below.  Id.

### B.     **Medical Evidence**[2]

During the period under review, plaintiff was treated by primary care physicians, neurologists, and physical therapists for pain related to cervical spondylosis and a seizure disorder

---

[2] Plaintiff here alleges that the ALJ improperly relied on the vocational expert's testimony to determine that there are jobs in the national economy that he can perform.  He does not challenge the ALJ's summation of the medical record or identification of serious impairments.  Thus, for the purposes of this review, the Court largely adopts the ALJ's review of the medical record.

4

that was diagnosed in 2016 after he lost consciousness while at work. A cardiology evaluation ruled out any underlying cardiac contribution to his loss of consciousness. (Tr. 328-30, 364-65, 362-63).

In Spring 2016, plaintiff had three episodes of "passing out," with feelings of warmness and some shaking on his left side, frequently accompanied by headaches. (Tr. 344-46, 289-93, 283-89). On May 12, 2016, neurologist Glenn Sherrod, D.O., diagnosed him with neurogenic spells, syncope seizure versus general motor seizure versus atonic seizures. Plaintiff was started on the medication Keppra and continued to take it throughout the period under review. EEGs completed in June and September 2016 were abnormal due to epileptogenic activity consistent with underlying seizure disorder. (Tr. 316, 317). An EEG in March 2017 showed paroxysmal activity consistent with paroxysmal disorder including seizure disorder. (Tr. 464). After starting on Keppra, plaintiff continued to complain of "weird feelings" and lightheadedness, but had no more seizures or episodes of losing consciousness. (Tr. 444-49, 433-38, 460, 582). In November 2017, he was released to drive. (Tr. 459-63).

Plaintiff had a history of neck pain and was diagnosed with cervicalgia and radiculopathy. (Tr. 431-32, 487-88). An MRI of the cervical spine completed in July 2017 showed a C6-C7 disc bulge and spondylitic changes resulting in mild cord compression and mild central canal stenosis; bilateral foraminal stenoses at C7, more so on the left; and central broad protrusion with annular fissure at C5-C6. (Tr. 407). There was some loss of cerebrospinal fluid signal at C6-C7.[3] (Tr. 467-68). Plaintiff received medial branch nerve blocks in November 2017 with significant relief. (Tr. 476-77, 474-75, 472-73, 470-71). At his request, another round of nerve blocks was

---

[3] On September 19, 2017, Charles Wetherington, M.D., reviewed the MRI of the cervical spine, listing the findings as mild arthritic changes throughout the cervical spine, C5/6 disc bulge without canal stenosis, and C6/7 disc bulge with mild canal stenosis, with "some loss of CSF signal around spinal cord at C6-7. No cord compression." (Tr. 465-69).

administered on April 18, 2018, but seemingly with less success because, on June 6, 2018, he complained of continued pain, numbness, and tingling.  (Tr. 470-71, 591-94).

Examination findings throughout the record reflect that plaintiff had left-sided cervical paraspinous tenderness, neck pain with range of motion testing and facet loading, decreased left-sided grip strength, and mild weakness in his left triceps.  (Tr. 487-88, 552-54, 484-85, 486, 589-91, 470-71).  In addition to the objective findings, plaintiff regularly reported having lightheaded-ness, occipital or cervicogenic headaches, tingling, and numbing.  (Tr. 320-22, 444-49, 433-38, 425-28, 484-85, 465-69, 478-89, 472-73, 470-71, 592-94).

C.    **Opinion Evidence**

On December 22, 2016, nonexamining physician Kevin Threlkeld, M.D., assessed plaintiff's  physical residual functional capacity based on a review of the records then on file.  (Tr. 59-61, 68-70).  Plaintiff was found to have a severe impairment in the category of other disorders of the nervous system.  (Tr. 58, 67).  Dr. Threlkeld opined that plaintiff had no exertional, postural, or communication limitations but was required to avoid concentrated exposure to extreme heat and all exposure to hazards.  The ALJ gave Dr. Threlkeld's opinion little weight because he did not have the opportunity to examine plaintiff or review subsequent records.  In addition, the limitations were inconsistent with the imaging studies of plaintiff's cervical spine and his symptoms.  (Tr. 21).

III.  <u>**Standard of Review and Legal Framework**</u>

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.  <u>See</u> <u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number

of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."   Id.   Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d

549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 15-23).  The ALJ found that plaintiff met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since October 17, 2016, the alleged onset date.  (Tr. 17).  At step two, the ALJ found that plaintiff had the severe impairments of cervical spondylosis and seizure disorder.  The ALJ analyzed plaintiff's medically determinable impairment of ADD under the paragraph B criteria (20 C.F.R., Part 404, Subpart P, Appx. 1) and determined that plaintiff had mild limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. 17-18).  Plaintiff does not challenge the ALJ's assessment of his severe impairments or paragraph B determination.  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, and specifically addressed listing 1.04 — disorders of the spine. (Tr. 19).

The ALJ next determined that plaintiff had the RFC to perform light work, except that he could never climb ladders, ropes, or scaffolds.  He was limited to occasional overhead reaching with the left arm, should have no exposure to hazardous materials and unprotected heights, and

9

should avoid concentrated exposure to temperature extremes.  (Tr. 19).  In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding his abilities, conditions, and activities of daily living.  (Tr. 19-21).  While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of his symptoms were "not entirely consistent with" the medical and other evidence.  (Tr. 20).  The ALJ cited inconsistencies between plaintiff's subjective allegations and other evidence in the record — specifically, his daily living activities and the results of physical and mental status evaluations.  (Tr. 20-21).  Plaintiff does not challenge the ALJ's assessment of his residual functional capacity.

At step four, the ALJ concluded that plaintiff was unable to return to his past relevant work as a machine operator.  (Tr. 21-22).  His age on the alleged onset date placed him in the "younger individual" category.  He had at least a high school education and was able to communicate in English.  Id.  The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether he had transferable job skills or not.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a furniture rental clerk, cashier II, and ticket seller.  (Tr. 22-23).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from October 17, 2016 through November 23, 2018 — the date of the decision.  (Tr. 23).

## V. <u>Discussion</u>

Plaintiff argues that substantial evidence does not support the ALJ's finding that there are jobs in the national economy in significant number that he can perform.  In particular, he argues that the (1) ALJ failed to address an apparent conflict between the vocational expert's testimony and the DOT with respect to overhead reaching;  (2) the vocational expert's definition of "full-time" employment conflicted with Social Security policy; and (3) the vocational expert's opinions did not have sufficient indicia of reliability to support her conclusion regarding the number of alternate jobs available in the national economy.

### A.      Conflict Between Vocational Expert's Testimony and DOT

The ALJ asked the vocational expert whether there were jobs available in the national economy that could be performed by an individual of plaintiff's age, education, and work background who was limited to occasional overhead lifting.  (Tr. 50).  In response, the vocational expert identified three jobs:  furniture rental clerk, cashier II, and ticket seller.  When asked whether her testimony regarding the requirements of these jobs was consistent with the DOT, she replied that it was, with the exception of the restriction on overhead reaching.[4]  She stated that the DOT "did not address overhead reach or reaching in any specific direction."  She testified that her testimony with respect to the restriction on overhead reaching was based on her "experience of doing job placement toward employment."[5]  (Tr. 52).  In the decision, the ALJ determined that the vocational expert's testimony was consistent with the information contained in the DOT.  (Tr. 23).

---

[4] According the vocational expert, the DOT also does not address time off-task, but that is not an issue here.

[5] At the time of the hearing in this case, the vocational expert had more than 20 years of relevant experience and had served as a vocational expert for the Social Security Administration for more than five years.  (Tr. 236-37).

Plaintiff argues the ALJ failed to engage in the analysis required by SSR 00-4P, in which the Social Security Administration addresses the use of vocational expert testimony. See 2000 WL 1898704 (S.S.A. Dec. 4, 2000). The Eighth Circuit has construed SSR 00-4p "as placing on the ALJ an affirmative responsibility to ask about 'any possible conflict' between VE evidence and the DOT, and to obtain an explanation for any such conflict, before relying on VE evidence to support a determination the claimant is not disabled." Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (citing Kemp v. Colvin, 743 F.3d 630, 633 (8th Cir. 2014)).

Plaintiff argues that there is an apparent conflict between the limitation on overhead reaching in the hypothetical and the DOT. In making this argument, plaintiff relies on guidance contained in the Vocational Expert Handbook, which states that, where an ALJ's hypothetical restricts overhead reaching, and the vocational expert identifies a job that "requires some degree of reaching, although not perhaps overhead[, t]here is an apparent conflict." Under this circumstance, the vocational expert must "[b]e prepared to explain how a person with the claimant's particular limitation can perform the cited job(s)." Pl. Brief at 7 [Doc. # 10] (quoting Vocational Expert Handbook at 39). Beyond citing the handbook, plaintiff does not specify how, in his estimation, the vocational expert deviated from this guidance. Rather, he argues generally that the vocational expert's testimony was insufficient, because her resume shows that her experience in job placement "involved accommodations and vocational rehabilitation subsidized employment," and thus is inadequate for determining how competitive jobs are performed in the open labor market. Pl. Brief at 8. This argument is completely misplaced: the vocational expert's resume was placed in the record more than a month before the hearing in this matter. (Tr. 2) (showing resume entered into record on July 3, 2018). At the hearing, plaintiff's counsel was given the opportunity to challenge the vocational expert's qualifications to offer testimony in this

case but declined to do so.  (Tr. 49).  Plaintiff cannot raise an objection to her qualifications at this late stage.

The Court now turns to the question of whether the vocational expert's testimony conflicted with the DOT.  Both the cashier II and ticket seller jobs require frequent reaching.[6]  1991 WL 671840, 1991 WL 671853.  The furniture rental clerk job, however, requires only occasional reaching and thus, defendant asserts, there is no apparent or actual conflict.  Def. Brief at 6 [Doc. # 13]; 1991 WL 672589.  The Court agrees:  logic dictates that, if the job requires only occasional reaching, it cannot exceed the ALJ's RFC limitation to only occasional overhead lifting and, thus, there is no conflict.  The Eighth Circuit has "consistently held that if substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the DOT, the ALJ properly relied on the testimony." Courtney v. Comm'r, Soc. Sec. Admin., 894 F.3d 1000, 1004 (8th Cir. 2018) (internal quotation and citation omitted).  Furthermore, an ALJ can "properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."  Id. at 1004-05 (citation and internal quotation omitted).  Thus, "unless a VE's testimony appears to conflict with the DOT, there is no requirement that an ALJ inquire as to the precise basis for the expert's testimony regarding extra-DOT information."  Id. at 1004.

Even if there were a conflict, however, the Court finds that the vocational expert's testimony provided a reasonable explanation for any conflict between DOT regulations and her testimony.  "When an ALJ has posed a hypothetical that accurately reflects [her] RFC finding, questioned the VE about any apparent inconsistencies with the relevant DOT job descriptions, and explained [her] decision to credit the VE's testimony, the ALJ has complied with SSR 00–4p, and

---

[6] Plaintiff does not address this point.

we review [her] decision under the deferential substantial evidence standard." Welsh, 765 F.3d at 930 (citing Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010)).

This case is distinguishable from the cases that plaintiff cites in which the vocational expert did not address apparent inconsistencies between the DOT definition and a claimant's limitations. See Moore v. Colvin, 769 F.3d 987, 989-90 (8th Cir. 2014) (holding that ALJ improperly relied on vocational expert's testimony that conflicted with DOT where vocational expert, when asked if her testimony was consistent with the DOT, stated merely, "Yes, it is"); Kemp *ex rel.* Kemp v. Colvin, 743 F.3d 630, 633 (8th Cir. 2014) (remanding for further proceedings because "the record does not reflect whether the [vocational expert] or the ALJ even recognized the possible conflict between the hypothetical describing a claimant who could reach overhead only occasionally," and the job as described in the DOT).  Here, in response to the appropriate question from the ALJ, the vocational expert explained how her testimony deviated from the DOT and then explained the basis for her knowledge.

Substantial evidence supports the ALJ's determination that the vocational expert's testimony was consistent with the DOT.

### B.    Full-time Employment

Plaintiff argues that the vocational expert's testimony was improperly based on a 35-hour work week rather than a 40-hour work week.  Thus, he asserts, the ALJ improperly relied on her testimony to determine that there were jobs in the national economy that someone with plaintiff's RFC could perform.[7]

The following exchange took place between plaintiff's counsel and the vocational expert:

Q:    And the national numbers that you cited — where do you get your figures?

---

[7] The vocational expert testified that, nationally, there were more than 50,000 jobs for furniture rental clerk, more than 800,000 jobs for cashier II, and more than 20,000 jobs for ticket seller.  (Tr. 50).

14

A:      From SkillTRAN and they get that through the Department of Labor
        updates through their licensing — it is a licensed, proprietary program.

Q:      . . . And is that data filtered for 40 hour a week jobs or does it include all
        jobs, including part-time?

A:      What I have is full-time employment.

(Tr. 52). Plaintiff's counsel did not ask for further clarification.

Plaintiff asserts that SkillTRAN defines full-time work as 35 hours a week or more, while the Social Security Administration defines full-time work as 40 hours a week. Pl. Brief at 9-10. Plaintiff argues that, because the vocational expert did not clarify what she meant by "full-time," she must have used a nonconforming definition of full-time and the ALJ erred in relying on her testimony. The Court disagrees: the ALJ asked the vocational expert to testify about the work available to an individual who could "sit, stand, and walk for six hours in an eight-hour day," thus specifying full-time work. (Tr. 50). The vocational expert provided job incidence numbers within that framework and separately affirmed that her testimony was based on full-time employment. As noted above, an ALJ can "properly assume that the expert framed [her] answers based on the factors the ALJ told [her] to take into account." Courtney, 894 F.3d at 1004-05. See also Kelly v. Colvin, No. 4:13 CV 1891 CDP, 2015 WL 94252, at *5 (E.D. Mo. Jan. 7, 2015) (vocational expert is "neither required to articulate the percentage of available jobs that [are] part-time or full-time, nor to describe labor market conditions beyond the data readily available.") (quoting Dipple v. Astrue, 601 F.3d 833, 836 (8th Cir. 2010)).

The ALJ's determination that jobs exists in significant numbers in the national economy that plaintiff can perform is supported by substantial evidence.

### C.      Reliability of the Vocational Expert's Opinion

Plaintiff finally argues that the ALJ failed to conduct a proper inquiry into the reliability of the vocational expert's opinion.

As quoted above, the vocational expert identified SkillTRAN as a "licensed proprietary program" that gets its information "through the Department of Labor updates through their licensing." (Tr. 52). Plaintiff asserts that this is incorrect — that SkillTRAN's information comes from "governmental data freely available on the internet." Pl. Brief at 13 (citing statements by company owner Jeffrey Truthan). "The data is not proprietary, and SkillTRAN does not purport to have any licensing arrangement with the Department of Labor or other government entity." Id. Plaintiff characterizes the vocational expert's testimony as misleading because it exaggerates SkillTRAN's relationship to governmental labor data. Id. Furthermore, he argues, the vocational expert did not heed SkillTRAN's warning that data for unskilled occupations may not be accurate. Id. at 14.

A similar challenge to the vocational expert's reliance on SkillTRAN was recently rejected by District Judge Ronnie L. White. Turner v. Saul, No. 4:18-CV-607-RLW, 2019 WL 4246841 (E.D. Mo. Sept. 6, 2019). In Turner, unlike here, the claimant presented an objection to the vocational expert's findings to the ALJ. In response, the ALJ cited the vocational expert's training and experience, as well as the Social Security Administration's reliance on vocational experts for determining the number of jobs available in the national economy for a particular RFC. See id. at *4. The ALJ also addressed Turner's criticism of the vocational expert's reliance on SkillTRAN, noting that she testified that "using SkillTRAN to obtain job incidence data by DOT code was an accepted method in the industry." Id. Judge White rejected Turner's attempt to discredit the vocational expert's "limited reliance on SkillTRAN based upon various materials that were not

16

part of the administrative record before the ALJ," including "various statements by SkillTRAN's creator Jeff Truthan."  As Judge White stated, "[b]ecause these materials were not before the ALJ, the Court cannot consider them now."  And the same holds true here.  Furthermore, Judge White held, "even if the Court were to consider these materials," the ALJ properly received job incidence data from the vocational expert, who "properly based her opinions on information she obtained from SkillTRAN using her 43 years of experience."  Id.  Here, the vocational expert's 20 years of experience is an adequate basis for relying on her testimony regarding SkillTRAN data.

Plaintiff asserts that the ALJ's failure to scrutinize the vocational expert's testimony violates the requirements set by the United States Supreme Court in Biestek v. Berryhill, 139 S. Ct. 1148 (2019).  There, as here, the vocational expert testified about unskilled jobs available for a hypothetical individual based on Biestek's RFC.  Id. at 1153.  When Biestek's attorney asked the vocational expert to identify the source of her information, she replied that she relied on the Bureau of Labor Statistics and her "own individual labor market surveys."  Id.  The ALJ rejected the attorney's request to have the private surveys produced.  Before the Supreme Court, Biestek argued that "the testimony of a vocational expert who . . . refuses a request for supporting data about job availability can never clear the substantial-evidence bar."  Id. at 1154.  A majority of the Supreme Court rejected that argument.

Biestek does not aid plaintiff's claim.  First, nothing in the opinion increases the standard required to meet the "substantial evidence" standard.  "Substantial evidence . . . is 'more than a mere scintilla,' but it . . . means—and means only—'such relevant evidence as a reasonable mind

17

might accept as adequate to support a conclusion.'"[8]  Id.  at 1154 (citations omitted).  Second, as plaintiff acknowledges, his argument is based on a dissent in Biestek.  Pl. Brief at 12.[9]

Plaintiff has failed to marshal argument or evidence beyond mere speculation to undermine the vocational expert's testimony and thus cannot establish that the ALJ erred by relying on that testimony.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of April, 2020.

---

[8] The court also rejected Biestek's argument that a vocational expert's refusal to provide her underlying data, without more, creates "an adverse inference" regarding her testimony.  See id. at 1156.

[9] Plaintiff quotes Justice Gorsuch's dissent:  "Where did these numbers come from?  The expert says she relied on data from the Bureau of Labor Statistics and her own private surveys.  But it turns out the Bureau can't be the source; its numbers aren't that specific.  The source — if there is a source — must be the expert's private surveys.")  Biestek, 139 S. Ct. at 1159.